UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ALTONIO D. WARREN,

                                   Petitioner,

                                                    **OPINION & ORDER**
                                                    **CV-07-4117**
        -against-


JAMES CONWAY,

                                   Respondent.
------------------------------------------------------- X
FEUERSTEIN, J.

        On October 28, 2003, two judgments of conviction were entered against petitioner

Altonio D. Warren (petitioner) in the County Court of the State of New York, Suffolk County

(Hinrichs, J.), (1) upon a jury verdict finding him guilty of manslaughter in the first degree (N.Y.

Penal Law § 125.20), gang assault in the first degree (N.Y. Penal Law § 120.07), assault in the

first degree (N.Y. Penal Law § 120.10(3) and two counts of assault in the third degree (N.Y.

Penal Law §§ 120.00(1)(2)), and (2) upon his plea of guilty to attempted promoting prison

contraband in the first degree (N.Y. Penal Law §§ 110/205.25(2)), and upon imposition of

sentences. On September 26, 2007, petitioner filed a petition seeking a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

        For the reasons set forth herein, the petition is denied and the proceeding is dismissed.


I.      BACKGROUND

        A.      Factual Background

1

The following facts were taken from the hearing transcript (H.) and trial transcript (T.):

1. <u>Suppression Hearing</u>

On September 9, 2002, a hearing was held, *inter alia*, on petitioner's motion to suppress testimony regarding a pretrial showup identification procedure and an in-court identification of petitioner on the basis that the showup procedure was unduly suggestive. At the hearing, Police Officers David Smith, Richard Gandolfo and Anthony Pascucci, Sergeant James Hickey and Lieutenant Gerard Gigante testified with respect to the showup identification procedure in issue.[1]

Sergeant Hickey testified that on October 5, 2001, he responded to the area behind Club 69, which is located on Main Street in Bay Shore, New York, following a radio transmission of a fight at that location. (H. 10-11, 18). Sergeant Hickey testified that when he arrived at that location at approximately 3:30 a.m., he observed "bedlam," i.e. a disturbance involving "a couple hundred people" in which some people were injured, outside the area of Club 69 and in the rear parking lots. (H. 11-12, 18-20, 33).

Lieutenant Gigante testified that during his shift on October 5, 2001, he received a local radio notification indicating that persons involved in an incident at Club 69 may have fled in a small, purple station wagon. (H. 104-105, 110, 132-133, 143). He testified that he also heard over the radio that Sergeant Gross, of highway patrol, had stopped a vehicle fitting that description on Howells Road, just south of Sunrise Highway, so he responded to that location. (H. 106, 110-111). When he arrived at approximately 3:30 a.m., the two people who had been in

---

[1] Those portions of the hearing which do not pertain to petitioner's motion to suppress identification testimony are not at issue in this habeas proceeding and, thus, will not be included herein.

the stopped vehicle were out of the vehicle and handcuffed. (H. 111, 131). He learned that the two individuals were petitioner and Danny Davis. (H. 111-112).

Lieutenant Gigante testified that he approached petitioner, who was seated on a curb directly behind the vehicle from which he was detained, and observed that his pocket was ripped, so he inquired how it became that way. (H. 115-116). According to Lieutenant Gigante, petitioner told him that he had walked through a fight at Club 69 between two (2) gangs, the Latin Kings and MS-13. (H. 116). Lieutenant Gigante then walked over to Davis, who was seated approximately twenty (20) to twenty-five (25) feet away from petitioner, and asked him how he had sustained a cut that was bleeding slightly. (H. 116-117, 144-147). According to Lieutenant Gigante, Davis just stared at him without responding. (H. 116, 144-145). When he asked Davis if he wanted medical attention, Davis replied "No, I'm fine." (H. 116-117, 145-147, 153).

Lieutenant Gigante testified that he advised Sergeant Hickey that he had stopped a station wagon fitting the radio description and inquired as to whether Sergeant Hickey had any potential witnesses that might be able to identify any subjects that were involved in the fight. (H. 118-119, 148). Sergeant Hickey notified him of a potential witness to the crime, so he requested that Sergeant Hickey arrange for the witness to be transported to his location for the purpose of conducting a "showup identification." (H. 118-119).

According to Sergeant Hickey, he had encountered a Mr. Sanchez at Club 69, who told him that he had witnessed the fight and an assault. (H. 12-13, 23). Sergeant Hickey sent Sanchez with Officer David Smith to the intersection of Howells Road and Sunrise Highway in Bay Shore, which was approximately a mile from Club 69. (Hickey: H. 12-13; Smith: H. 42-44,

3

67). Sergeant Hickey testified that he informed Sanchez that "he was going to go with an officer to participate in a show-up and see if he could identify possible suspects." (H. 13-14, 26). Officer Smith transported Sanchez to the showup at approximately 3:50 a.m. (Hickey: H. 14; Smith: H. 46; Gigante: H. 119).

Smith testified that at the intersection of Howells Road and Sunrise Highway, he observed a maroon Toyota "station wagon like vehicle" and two (2) black males approximately ten (10) feet apart on the sidewalk or curb behind the vehicle. (H. 44-47, 57-59). There were one (1) or two (2) police officers near the subjects, as well as other officers in the area. (Smith: H. 47, 58-59; Pascucci: H. 175-176). Officer Smith pulled to within approximately twenty (20) feet of the rear bumper of the Toyota and, according to Officer Smith, Sanchez spontaneously stated: "That's the vehicle. That's them." (Smith: H. 47-48, 57, 61; Gigante: H. 120). Officer Smith denied talking to Sanchez, asking him any questions, making any suggestions to him that the police had caught the people responsible for the incident or otherwise discussing what was going to occur at the showup location prior to Sanchez's identification. (H. 48, 60). According to Officer Smith, during the drive, the only conversation he had with Sanchez related to Sanchez being scared, to which he responded that the police would protect him. (H. 53-54, 64).

Lieutenant Gigante testified that, following Sanchez's spontaneous statement, he explained to Sanchez that he was going to show him a couple of people one at a time and Sanchez was to let him know if he could identify them as having been involved in the disturbance at Club 69. (H. 122, 136). Officer Smith testified that after Lieutenant Gigante spoke with Sanchez, Sanchez identified each suspect separately. (H. 49). An officer accompanied each subject separately to the middle of the road approximately twenty (20) feet in

4

front of Officer Smith's vehicle, which was illuminated by the headlights of Officer Smith's vehicle and streetlights. (Smith: H. 50, 57, 61-63; Gigante: H. 121-123; Pascucci: H. 162). Although the subjects were handcuffed, they had their arms behind their backs, so the handcuffs were not observable. (Smith: H. 62; Gigante: H. 121). However, on cross examination, Lieutenant Gigante testified that is was possible that Sanchez could have observed the handcuffs while the subjects walked to the spot where the showup occurred. (H. 139). Lieutenant Gigante did not make any suggestions to Sanchez that the subjects of the showup were the perpetrators of the crime. (Smith: H. 49; Gigante: H. 125, 136). According to Officer Smith, Lieutenant Gigante merely asked Sanchez if he recognized anybody that had been at Club 69, to which Sanchez replied in the affirmative. (H. 50). With respect to Davis, Sanchez not only indicated that he was one of the persons that was involved in the disturbance and fight at the bar, but, according to Officer Smith, he also indicated that Davis had said "You want some of this, too," to Sanchez at the scene. (Smith: H. 51, 59, 63; Gigante: H. 123). With respect to petitioner, Sanchez only identified him as being involved in the fight at Club 69. (Smith: H. 59; Gigante: H. 124, 137). According to Lieutenant Gigante, Sanchez also volunteered that the vehicle that had been stopped was the car into which he saw the two (2) subjects enter and leave the scene at Club 69. (H. 124). Sanchez never left Officer Smith's vehicle during the identification procedure. (H. 59).

Following the showup, at approximately 3:55 a.m., Officer Smith took Sanchez to the Third Precinct at Lieutenant Gigante's request. (Smith: H. 51-52; Gigante: H. 124-125). Officer Smith denied that Sanchez ever came into contact with Dennis Hodge, the other person who participated in a showup procedure that night. (H. 52-53).

5

Sergeant Hickey also testified that he spoke with Dennis Hodge at Club 69, who told him that he had witnessed the fight and saw who was involved. (H. 14-15, 23). According to Sergeant Hickey, another police officer had brought Sanchez to him and identified him as an eyewitness, whereas Hodge approached him directly. (H. 24-25, 28, 37). Sergeant Hickey sent Hodge with Officer Richard Gandolfo to the intersection of Howells Road and Sunrise Highway to conduct a showup identification. (Hickey: H. 14-15; Gandolfo: H. 74). According to Sergeant Hickey, he told Hodge the same thing he had told Sanchez about the identification procedure, i.e. that "[h]e was going to accompany an officer to see if he could identify possible suspects." (H. 15, 27). Officer Gandolfo transported Hodge and his girlfriend to the showup at approximately 4:25 a.m. (Hickey: H. 15-16; Gandolfo: H. 75, 78-81). Hodge was reluctant to participate in the showup because he was afraid. (Gandolfo: H. 75, 99; Gigante: H. 149). Officer Gandolfo denied any conversation with Hodge during the ride to the showup, except to advise Hodge to relax because he was very nervous and to advise Hodge and his girlfriend not say a word during the drive, either to him or to each other. (H. 82-83, 98-99).

When Officer Gandolfo arrived for the showup, Lieutenant Gigante approached his vehicle and spoke with Hodge. (Gandolfo: H. 76; Gigante: H. 126). Lieutenant Gigante explained to Hodge that they were going to let him view a couple of people and to let the officers know if one or both of the subjects had been involved with the disturbance at Club 69. (Gandolfo: H. 76-77, 85; Gigante: H. 126-127, 141). Officer Gandolfo denied that Lieutenant Gigante said that the subjects were in fact at the crime scene and Lieutenant Gigante denied ever informing Hodge that the subjects were suspects. (Gandolfo: H. 77; Gigante: H. 141). An officer brought each of the subjects separately to an area approximately twenty (20) to twenty-

6

five (25) feet in front of Officer Gandolfo's vehicle that was illuminated by his "bright lights," headlights and a spotlight. (Gandolfo: H. 77-78, 86, 89-91; Gigante: H. 127, 138; Pascucci: H. 163). Hodge identified both subjects as having been at the scene of the Club 69 disturbance. (Gandolfo: H. 88; Gigante: H. 127-128). Lieutenant Gigante testified that Hodge identified the vehicle behind the subjects as the car in which they left the Club 69 scene. (H. 128). On cross examination, Lieutenant Gigante testified that it was possible that Hodge observed the subjects in handcuffs while they walked to the spot where the showup occurred and blood on Davis's shirt. (H. 142, 151).

Sergeant Hickey denied ever giving Sanchez or Hodge any indication that the police had the people responsible for the assault in custody or making any suggestions to them that the people being detained were in fact the perpetrators of the crimes that were being investigated. (H. 16). In addition, none of the officers perceived Sanchez or Hodge to have been intoxicated or under the influence of drugs. (Hickey: H. 23; Smith: H. 55; Gandolfo: H. 82; Gigante: H. 136).

After the showup, at approximately 4:40 a.m., Officer Gandolfo transported Hodge to the Third Precinct at Lieutenant Gigante's request. (Gandolfo: H. 79-80, 92; Gigante: H. 128). Officer Gandolfo denied that Hodge had any contact with any other person that had participated in a showup procedure at the precinct. (H. 79, 92-93). Following the showup, at approximately 4:40 a.m., petitioner and Davis were placed under arrest and Lieutenant Gigante directed Officer Bustamante to transport petitioner to the precinct and Officer Pascucci to transport Davis to Good Samaritan Hospital for medical treatment. (Gigante: H. 129, 137-138; Pascucci: H. 163).

An order dated September 30, 2002 denied petitioner's application to suppress the identification of him by Sanchez and Hodge, finding, in pertinent part, as follows:

"The decision by Lt. Gigante to arrange a prompt in-the-field showup was reasonable under the circumstances, particularly since [petitioner], whose pocket was ripped, said that he had been at the Club 69 fight and defendant Daniels [sic] was observed with a fresh puncture wound to his neck area and blood on the front of his shirt.

The first witness, Josue Sanchez, viewed both of the suspects separately less than one hour after the crime occurred under sufficient lighting conditions, both at the crime and showup scenes.

The second witness, Dennis Hodge, likewise observed both subjects separately less than ninety minutes after the crime occurred under sufficient lighting conditions both at the crime scene and the showup scene. There is no evidence that Sanchez or Hodge spoke to each other prior to the showup or that they were interviewed by the police in the presence of each other.

Under these circumstances, the prosecution has met its burden of establishing that the showups conducted by the police were reasonable and proper and motivated by sound investigative reasons.

The defendants argue that the police created a 'suggestive' atmosphere, emphasizing the fact that the defendants were in handcuffs, escorted by the police to the viewing point with a large crowd nearby and a significant police presence at the site of the showup.

In the court's view, none of these factors, either individually or collectively, created a substantial likelihood of misidentification by either of the two witnesses.

Since the detaining officers has a reasonable suspicion that the defendants had been involved in a serious crime and were potentially dangerous individuals as members of a notable gang, their immediate use of handcuffs to secure their own safety until other officers arrived was certainly reasonable.

The continued use of the handcuffs during the actual showup was justified by the confirming admission of [petitioner] and the physical appearance of the two defendants. The use of handcuffs per se is insufficient to invalidate an otherwise proper showup. (Citations omitted).

Furthermore, the fact that the police used a successive showup procedure displaying the two defendants to the witnesses without any time break is likewise insufficient to invalidate the two showups. (Citations omitted).

Finally, the showups in this case were not rendered unduly suggestive by the

circumstances that the defendant's [sic] were being guarded by the police in the company of another suspect or by the witnesses' knowledge that the purpose of the showup was to view a possible suspect. (Citation omitted).

Nor does the record before the court establish that the presence of a crowd in the vicinity of the [showup] was a significant factor or circumstance contributing to a substantial likelihood of irreparable misidentification of the defendants by either of the two witnesses."

People v. Warren, Nos. 2231A-01, 2231C-01 (N.Y. Co. Ct., Suff. Co. Sept. 30, 2002) (Corso, J.) (order denying suppression).

### 2. The Trial

#### a. The People's Case

##### i. Eyewitness Testimony

On October 4, 2001, between 10:00 and 11:00 p.m., Alexander Nieves ("Alex"), Jose Torres ("Torres"), Alejandro Nanez ("Nanez") and "Muncho" went together to Club 69, located on Main Street in Bayshore, New York. (Alex: T. 492-493, 542; Nanez: T. 728-729, 758-759). At approximately 1:00 a.m. on October 5, 2001, Alex's older brother Jose Nieves ("Jose") arrived at the club. (Alex: T. 492-493, 545; Nanez: T. 729). Jose was a member of the Latin Kings gang and was known in the community as "King Blast." (Hodge: T. 129-130; Sanchez: T. 268, 312, 314; Alex: T. 548-549). Dennis Hodge ("Hodge") and Josue Sanchez ("Sanchez"), both of whom knew Alex and Jose, were also at the club. (Hodge: T. 128-129; Sanchez: T. 263-265, 298, 312). According to Alex, he and his friends consumed approximately two (2) or three (3) alcoholic drinks at the club. (T. 494). He denied being intoxicated and testified that his friends were "more buzzed" than him. (T. 555-557). Nanez testified that he had more than six

9

(6) drinks that night and was "feeling the effects of that alcohol." (T. 730, 759, 774).

Alex testified that at approximately 1:00 or 2:00 a.m., he observed that the racial makeup of the patrons of the club was "mostly all black males." (T. 494, 561). At some point thereafter, an argument ensued somewhere in the club, as a result of which the club's bouncers made everybody leave the club. (Alex: T. 495, 544, 576; Nanez: T. 730-731; Hodge: T. 130, 176; Sanchez: T. 266, 271-272, 311-312). According to Alex, his brother Jose waved to him to get out of the club, and said "There is an argument going on, let's just leave." (T. 495-496, 577). Alex left the club with his friends and brother through the rear door. (Alex: T. 496; Nanez: T. 731, 735). Nanez testified that a group of black males followed them out the back door of the club. (T. 731, 750). Hodge testified that most of the fifty (50) to seventy (70) people that were inside the club, including himself, exited the club through the back door and into a parking lot. (T. 131). Sanchez testified that although most of the people exited the club through the back door, he exited the club through the front door because a security guard stopped him from going out the back. (T. 272).

When they left the club, at approximately 3:00 a.m., there was a man in a red shirt outside the club. (Alex: T. 496-497; Nanez: T. 732). Alex described the man as a black male in his mid-twenties, approximately six feet tall and heavy, with small dreadlocks. (T. 497-498). The man was saying "Bay Shore Bloods, this is my hood, my territory." (Alex: T. 497, 534-535; Nanez: T. 732, 776). Alex and Nanez later identified the man in the red shirt as Christopher Passias, whose nickname was "Fats" (hereinafter, "Passias" or "Fats"). (Alex: T. 512; Nanez: T. 742-743). Alex testified that his brother told him to just "get in the car and let's go home." (T. 498, 545). Nanez testified that he approached Passias and told him "the beef is not with us" and the

10

two shook hands. (T. 732, 777). According to Nanez, that was when he "got hit blindsided from the right," and was knocked unconscious. (T. 732, 734, 747, 775). He did not know who hit him. (T. 733). Nanez testified that when he regained consciousness, his chain and cell phone were missing. (T. 740). He did not know who took those items. (T. 740-741).

Alex testified that in addition to Passias there were approximately fifteen (15) to twenty (20) black males "all lined up together" outside the club. (T. 499). According to Alex, his brother Jose said to the group of black males "We don't have no problem with you guys, we just want to leave," but the group would not let them leave and surrounded them. (T. 577). Alex testified that Jose was standing in between himself and Nanez when all of a sudden he saw Jose get hit. (T. 499).

Hodge testified that at some point after he left the club, he saw Jose "a distance away" from the back door on the ground, surrounded by a group of approximately ten (10) to fifteen (15) people, some of whom were kicking and hitting him. (T. 133-135, 187, 190-193). According to Hodge, all of the people in the group kicking Jose were black and some had dreadlocks. (T. 133, 179). Hodge testified that he then saw two (2) people from the group run to a car, which he described as a burgundy Honda Accord station wagon. (T. 136-137). He identified the two people as petitioner and Davis. (T. 136, 138, 146). He testified that petitioner and Davis were standing in the group around Jose, but he did not know if they had kicked, punched or stabbed Jose. (T. 137, 160-161, 191, 197-199). He also did not know in which direction the car they got in drove off. (T. 138, 163-165). Hodge further testified that once the group kicking Jose scattered, he observed that Jose's head was swollen, his eyes were blackened, his face was purple and he had what appeared to be a stab wound in his side from which blood

11

was dripping. (T. 155-156, 184, 193-194). Jose did not look like he was breathing and "was just stiff laying on the floor on his side." (Hodge: T. 156; Alex: T. 522; Nanez: T. 738-739).

After Jose was hit, Alex was hit several times, so he did not see anything else after that. (T. 499-500, 535). According to Alex, it felt like ten (10) people were hitting him with their fists and kicking him, then he staggered into a garbage dumpster and fell. (T. 500, 535). He testified that he continued being hit even after he fell, so he curled up in a ball to protect himself. (T. 500, 503, 538). According to Alex, he was struck in the head and face and kicked in the stomach. (T. 501). He did not lose consciousness, but he was bleeding from his face and back. (T. 501, 507). Hodge testified that he saw Alex leaning against a wall on his knees holding his head and crying. (T. 139, 157). According to Hodge, Alex was scratched, cut and swollen "a little bit." (T. 139). Hodge denied ever seeing petitioner or Davis punch, stab or kick Alex. (T. 167). Alex testified that while he was being beaten, he heard somebody say "Take his money" and felt somebody reach into his pockets and take approximately seventy dollars ($70.00) out. (T. 503, 538-539). He did not know who took the money or who beat him. (T. 503, 527, 535).

Alex testified that after his beating stopped, he got up off the ground and looked for his brother. (T. 501). When he saw Jose on the ground, he knelt next to him and said "That's my brother, that's my brother." (T. 501-502). According to Alex, he heard somebody say "Is that your man, that's your man," so he looked up and got hit again three (3) to four (4) times in the face. (T. 502, 505-506). He described the person who hit him as a black male with a white cutoff shirt and dreadlocks. (T. 504, 528). He saw two (2) males at that time, both of whom had shoulder-length dreadlocks. (T. 504-505, 528-529, 547). He did not see where the men went after they stopped hitting him. (T. 506). Alex was unable to identify the two assailants in court,

but testified that petitioner and Davis had the same style dreadlocks as the assailants. (T. 518-519, 527-528). He testified that he never saw petitioner or Davis kick or strike him, his brother or anyone else that night and did not know if they, in fact, did so or were even there that night. (T. 528, 564, 566, 581).

Alex, Nanez, Hodge and Sanchez all testified that immediately after the incident they observed "Muncho" lying on the ground, bleeding and choking on his own blood. (Alex: T. 522; Nanez: T. 734-735, 751; Hodge: T. 139; Sanchez: T. 273-274). According to Nanez, he pushed "Muncho" onto his side so he could breath better. (T. 735). Torres ran toward Nanez to help him with "Muncho." (T. 735). Nanez testified that at the same time, a "blue grayish" Honda Accord station wagon stopped next to them, from which a black male exited, said something, then hit Torres in the face. (T. 735-736, 748-749, 765-767). He described the assailant as a "tall black male with dreads * * * wearing a white t-shirt." (T. 735, 748-749). According to Nanez, the assailant ran back into the car and the car sped off. (T. 736, 749-750, 766-767). According to Sanchez, as he was near "Muncho," a Honda station wagon, which appeared gray at that time, suddenly stopped beside him and two (2) people exited. (T. 274-276). Sanchez described the two individuals who exited the car as black males in their mid-twenties wearing long dreadlocks and testified that the driver of the vehicle was wearing a bloodied white shirt and the passenger was wearing a cream sweater with shoulder pads. (T. 276-277, 285-285). According to Sanchez, the driver, whom he later identified as Davis, approached him and asked him if he "wanted it," meaning if he wanted to fight. (T. 274-276, 294, 321). He replied "No, chill out, I'm just trying to help out" and nothing happened. (T. 275, 279). According to Sanchez, the passenger, whom he later identified as petitioner, exited the car and said "I'm crazy, yeah, I'm crazy, Wyandanch,

13

Wyandanch," then went to the crowd and asked Alex if Jose was his brother. (T. 275, 280, 295, 322). Sanchez did not see anything else at that time because he was helping "Muncho." (T. 275).

Nanez and Hodge then assisted "Muncho" into a Jeep Cherokee owned by Sanchez. (Nanez: T. 743-744, 748; Hodge: T. 140, 166, 177-178). Sanchez testified that as he was trying to get "Muncho" into his car with the help of some other guys, including Hodge, petitioner came back and asked "some guy," who he later learned was Torres, if "Muncho" "was his boy," i.e. his friend. (T. 275, 281, 284). When Torres responded in the affirmative, petitioner punched him in the face, got back into the car and left "into Main Street." (T. 275, 281-283, 312-313). Sanchez left the scene to take "Muncho" to the hospital, then returned. (T. 284).

Nanez testified that he did not see petitioner or Davis hit anybody on October 5, 2001, participate in the altercation or get out of the Honda. (T. 758, 767-768).

Hodge testified that the police arrived at the scene and he approached one of the officers and told him what happened. (T. 140-141). According to Hodge, the police officers put him in the back of a police car, drove him to an area on the service road of Sunrise Highway where they had pulled "the two gentlemen" over and asked him if those men were at the scene. (T. 141-142, 181). He testified that he answered in the affirmative. (T. 141, 183-184). According to Hodge, the two men were shown to him outside the car, standing up with their hands behind their backs, which he assumed meant that they were handcuffed. (T. 143). In addition, Hodge identified the vehicle at the scene of the showup procedure as the one he described leaving the scene of the incident. (T. 143-145).

Hodge admitted that he had been arrested "a couple of times" for assault in the third

14

degree, as well as for having some marijuana in the car, to all of which he had pled guilty. (T. 147-148). In addition, Hodge admitted that he had a pending misdemeanor charge for assault in the third degree. (T. 148).

Sanchez testified that when a police officer arrived, he told them in which direction he observed a gray Honda drive away. (T. 283, 317). Then another officer was asking around for witnesses, but nobody came forward, so he indicated that he had "seen something." (T. 283). According to Sanchez, the officer then said "okay, we caught these guys, I want you to tell me if they're the ones, if they were here." (T. 283). He then accompanied the officer to a location near Sunrise Highway, at which time he observed the Honda station wagon, which at that time, with the police lights shining on it, looked light purple not gray. (T. 286-287, 318). He testified that he identified the car to the officers as the one he saw at the scene. (T. 288). He also testified that he saw the same two (2) men sitting on the sidewalk. (T. 288). The officers put the high beams on them and he identified them as the two (2) men he had seen at the scene. (T. 288-289). Sanchez identified the individual who was wearing the white bloody shirt as Davis, and the individual who was wearing the sweater and who had punched Torres as petitioner. (T. 289-290, 296).

Sanchez also denied ever seeing petitioner or Davis kick, stab or punch Jose or Alex. (T. 313, 321-322). In addition, he denied drinking any alcoholic beverages or doing any drugs on the night of the incident. (T. 316).

Samuel Wallace testified that on October 5, 2001, he lived across the street from the parking lot where the incident occurred. (T. 641-642, 681). On that date, he was in his apartment when he heard "a lot of commotion" in the parking lot, so he went outside to the back

15

part of the parking lot. (T. 642, 682, 705-706). He testified that he saw "a bunch of people on somebody,""a mob of people,"and "two different guys." (T. 642-643). According to Wallace, he did not see the faces of the two men, but he "saw like hair flopping up and down looking like dreads." (T. 643). He also testified that the people he observed in the parking lot were black and Hispanic and that they were physically fighting. (T. 643). Specifically, Wallace testified that he observed an Hispanic man running from "mainly black guys," then the Hispanic man "went down" and Wallace observed him "getting beat up on the ground," a "bunch of people on [him]," and being "stomped on and kicked." (T. 645-649, 710-712, 721). He testified that a few of the black guys running after the Hispanic man wore "dreads in their hair." (T. 646-647). In addition, he testified that the "guys" who were "stomping" on the Hispanic man had dreadlocks. (T. 648). Wallace returned to his apartment and called 911, then he returned to the scene. (T. 649). According to Wallace, when he returned to the scene he observed individuals whom he knew as "Fats" and "Rolo", and later learned were Christopher Passias and Rodney Hammonds, respectively, leaving the scene in a car. (T. 651, 701, 715-716). On cross examination, Wallace testified that he used to buy crack cocaine from "Fats." (T. 706-707). He testified that those individuals were involved in the incident. (T. 651) Wallace testified that after those individuals left, he walked closer to the man who was attacked and identified that man as "Blast." (T. 652).

Wallace testified that approximately thirty (30) to forty (40) minutes after the incident, he rode his bicycle to a green house on Brook Avenue and Harrison place, out of which crack cocaine is sold, where he saw "Fats." (T. 654, 695-696, 704). According to Wallace, he said to "Fats": "You know you killed Blast" or "you know you guys killed that guy" and Fats responded: "Who gives a F" or "Yes, so what." (T. 654, 696-697, 714). Wallace then returned home. (T.

654-655).

Wallace testified that he spoke with the police about the incident and that he identified "Fats" and "Rolo" to the police as being involved in the incident. (T. 680, 692-693). On cross examination, Wallace testified that when he gave a statement to police following the incident, he indicated that he saw two (2) black males kicking an Hispanic male on the ground, and that he identified those men as "Fats" and "Rolo." (T. 699). According to Wallace, he saw twenty (20) people involved in the incident, but he only knew those two. (T. 699-700, 712, 716). He admitted that he never told the police in his prior statement on October 9, 2001 that he saw someone with dreadlocks kicking the Hispanic man. (T. 700). However, on redirect examination, he testified that he told the police on October 5, 2001 that two (2) individuals with dreadlocks were kicking and fighting and "stomping, jumping up and down." (T. 717-719).

On cross examination, Wallace denied seeing petitioner or Davis on the night of the incident. (T. 683-684, 712-713). He also denied ever seeing petitioner or Davis "hanging out with" "Fats" or "Rolo." (T. 686). He testified that he never identified petitioner or Davis as kicking anybody on the date of the incident. (T. 694, 712-713). On redirect examination, he testified that he did not know if petitioner or Davis were at the scene or not. (T. 720).

Wallace admitted that he was convicted (a) of attempted petit larceny and attempted criminal impersonation in 1977, for which he was sentenced to a fine and probation for one (1) year; (b) of criminal possession of a controlled substance (cocaine) in 1988 and 1990, for which he was sentenced to terms of imprisonment of thirty (30) days for each conviction; (c) in state court, of possession of a controlled substance (cocaine) later in 1990, for which he was sentenced to a term of imprisonment of one and one-third (1-1/3) to four (4) years; and (d) of "another

17

cocaine charge," involving sale or attempted sale of cocaine, in 1997, for which he was sentenced to a term of imprisonment of two (2) to four (4) years. (T. 677-679). In addition, Wallace admitted that he had criminal charges pending against him involving "some kind of harassment and resisting arrest" and "another misdemeanor possession of cocaine." (T. 679-680, 703).

## ii. The Investigation

Police Officers Philip McSherry and Daniel Colondona testified that on October 5, 2001, they received a radio transmission to respond to a riot behind Club 69 in Bay Shore, New York. (McSherry: T. 202-204; Colondona: T. 228). Officer Colondona testified that en route to that location, he observed a dark colored automobile pass him at a high rate of speed heading northbound on Maple. (T. 229-230, 237-238).

According to Officer McSherry, he stopped his car at the intersection of Maple Avenue and Gibson Street looking for a large crowd or disturbance. (T. 204). Approximately thirty (30) seconds later, Officer McSherry received a call from Officer Colondona, who was at the scene of the disturbance, asking him to stop a car that was leaving the scene at a high rate of speed. (McSherry: T. 205; Colondona: T. 230-231). According to Officer McSherry, he observed a car "in a hurry to get out of there," so he blocked that car from exiting the parking lot and approached the driver. (T. 205). He described the driver as a young black female, approximately twenty-two (22) years old in a "semi-hysterical state." (T. 206, 217-218). She was alone in the vehicle. (T. 206). Officer McSherry testified that based upon information he received from the young female he had stopped, he placed a radio transmission at approximately 3:27 a.m. to be on the lookout for a burgundy Honda Accord station wagon with several black males in it that was

18

possibly heading toward Wyandanch. (T. 208-209, 225).

Officer McSherry testified that after speaking with that female, he found Officer Colondona, who had radioed to him that several people had been injured. (T. 207). There were approximately seventy-five (75) to one hundred (100) people at the scene and "a lot of movement" or frenzy in the general area. (McSherry: T. 210, 218-219, 221-222; Colondona: T. 231-232). Officer Colondona testified that he observed that Jose was laying on the concrete and was "beat up pretty bad." (T. 232). According to Officer Colondona, Jose was unresponsive to any question posed to him and he was not breathing too well. (T. 236). Officer Colondona further testified that other individuals were injured as well. (T. 236-237).

Sergeant Jeff Gross testified that he was at the Third Precinct when he heard a local radio transmission to look out for a burgundy Honda Accord station wagon that was possibly heading toward Wyandanch. (T. 241-242). According to Sergeant Gross, as he traveled south on Fifth Avenue from the Third Precinct, he observed a vehicle matching that description traveling at a high rate of speed heading westbound on Howells Road, east of Fifth Avenue. (T. 242, 258). Sergeant Gross immediately turned his vehicle around and radioed the dispatcher that he had seen the vehicle. (T. 243). At approximately 3:30 a.m., on Howells Road by the south service road of Sunrise Highway, Sergeant Gross pulled the vehicle over by putting on his emergency lights. (T. 243, 247). He described the vehicle as a burgundy Honda Accord station wagon. (T. 246). Another Third Precinct unit and an Emergency Service Unit arrived at the scene and directed that the people in the vehicle exit the vehicle. (T. 244). The occupants of the vehicle complied and two (2) officers handcuffed them. (T. 244). Sergeant Gross described the occupants of the vehicle as two (2) black males. (T. 245). He later ascertained that they were

19

petitioner and Davis. (T. 245). According to Sergeant Gross, Davis was driving the vehicle and was bleeding from the neck when he exited the vehicle. (T. 245, 254-255).

The trial testimony of Lieutenant Gigante, Anthony Pascucci was consistent with their hearing testimony regarding, *inter alia*, the showup identification procedure. (T. 346-360, 369-442).

Detective William Lewis testified that he arrived at the Third Precinct on October 5, 2001 at approximately 7:00 a.m. and saw Officer Pascucci with Davis in the uniform prisoner processing room. (T. 824-826). He observed that Davis had a bandage on the left side of his neck and some reddish stains on his shirt. (T. 833). Detective Lewis testified that he received a clear plastic bag from Officer Pascucci, which contained, *inter alia*, a New York State order of protection against Jose Nieves and eight hundred six dollars ($806.00). (T. 826-827, 830).

Detective Lewis and Detective Leroy Smith came into contact with petitioner in the detective squad room area of the Third Precinct at approximately 9:00 a.m. on October 5, 2001. (Lewis: T. 834, 836; Smith: T. 969). Both detectives testified that they observed petitioner rubbing his shoes together, then brushing or wiping them against the back of his pants, which brought their attention to petitioner's feet. (Lewis: T. 836-839, 870; Smith: T. 972-975, 1027-1029). Petitioner was wearing black or dark-colored Uptown boots. (Lewis: T. 836; Smith: T. 975). Detective Lewis testified that he noticed that there was reddish brown stains on the tops, fronts and sides of petitioner's boots, (T. 839-841), and Detective Smith testified that he saw spots on petitioner's boots that appeared to be blood, (T. 975). Thereafter, Detective Smith took the boots and gave them to Detective Robert Henn to be processed as evidence. (Lewis: T. 839-841; Smith: T. 970, 979; Henn: T. 1079, 1087). Seven hundred ninety-two dollars ($792.00) was

20

also taken from petitioner's pocket. (Lewis: T. 842-843; Smith: T. 971).

Detective Smith testified that after he recovered petitioner's boots, he went into the interview room where Davis was being held and observed that Davis was wearing Black Timberland boots spotted with what appeared to him to be blood. (T. 977). Thereafter, Detective Smith recovered the boots from Davis and gave them to Detective Henn to be processed as evidence. (Smith: T. 977-979; Henn: T. 1087). The crime lab initially rejected the evidence brought to it by Detective Henn because it was not packaged properly, insofar as the evidence had not been sealed with evidence tape, initialed and dated by Henn. (Smith: T. 1030-1033, 1043-1044, 1049, 1060-1061, 1073-1074; Gallagher: T. 1119). The evidence bag had been sealed with staples and initialed by Detective Henn, but Detective Henn did not also seal the bag with evidence tape and initial the tape as required by police procedure at that time. (Smith: T. 1044, 1064-1065; Henn: T. 1084, 1091, 1101, 1106-1108; Gallagher: T. 1119-1120, 1127-1130).

Diane Alia, a forensic serologist at the Suffolk County crime laboratory, (T. 1134-1135), testified that she analyzed the boots recovered from Davis. (T. 1138-1141). According to Alia, she identified two (2) stains on Davis's left boot and two (2) stains on Davis's right boot and she identified three (3) out of four (4) of them as blood. (T. 1142-1144). According to Alia, the stain on the bottom of Davis's left boot was negative, but the stains on the top and right side of the left boot and the "furthermost front" of the right boot tested positive as blood. (T. 1144-1145, 1149). Alia testified that the stains on the top and right side of Davis's left boot were drops, indicating that the blood came through the air and was deposited on the surface of the boots, as opposed to being made from coming into contact with an item containing blood. (T. 1145-1147). Alia further testified that it was difficult to interpret from where the blood on

Davis's right boot came because it was on textured rubber. (T. 1148). According to Alia, the stains on Davis's boots were not consistent with somebody walking through blood because the pattern was not consistent and there was not blood on the bottom of either boot. (T. 1149-1150, 1234). On cross examination, Alia testified that if an individual was stomping on another individual on the ground, there would be blood on the bottom of the boots. (T. 1209). Alia collected the blood samples from Davis's boots and submitted them for DNA testing, which was performed by Robert Baumann. (T. 1149). Baumann testified that Jose Nieves could have been the source of the blood on Davis's right boot. (T. 1255, 1260-1261). Davis was the source of the blood on his own left boot, although one stain was a mixture of both Jose's and Davis's DNA. (Alia: T. 1217; Baumann: T. 1255-1257).

Alia also analyzed the boots recovered from petitioner and recovered two (2) "representative" stains from the right sides of each boot in November 2001. (T. 1150-1152). According to Alia, there was more blood on petitioner's boots than Davis's boots so she picked just two stains which appeared large enough on which to do all necessary testing. (T. 1151-1152, 1154). Alia testified that she also observed red stains on the laces and soles of the boots, as well as on the heel of the right boot. (T. 1152-1153). According to Alia, the surface of petitioner's boots were fabric and, thus, very porous, making pattern interpretation, i.e. whether the stain was a drop or a contact stain, very difficult. (T. 1154, 1157, 1161, 1190, 1202). Alia testified that both stains tested positive as consistent with human blood. (T. 1154-1155). According to Alia, a stain recovered from the tip of petitioner's boot in April 2003, at the request of the prosecutor, also tested positive as being consistent with human blood. (T. 1157). Alia testified that a stain on the bottom of petitioner's right boot could have been made by walking through blood, but that

not all of the stain on the upper portion of that boot could have been made that way because of where the stains were located, i.e. on the arch area of the foot, the toe of the right boot and on the left side of the left boot. (T. 1158-1160, 1202, 1235). According to Alia, no blood was recovered on the instep area of the right foot. (T. 1160). In addition, Alia testified that not all of the stains on petitioner's boots could have occurred as part of one incident. (T. 1161-1162). Baumann testified that the blood recovered from both of petitioner's boots was a match with the DNA profile of Jose Nieves, and excluded petitioner and Davis as sources. (T. 1255, 1257, 1261-1264, 1266).

Detective Smith testified that during the course of his investigation, he received information from a confidential informant regarding the whereabouts of Passias and Hammonds, so he contacted the police in Bristol, Tennessee who apprehended those individuals. (T. 1005). Passias and Hammonds were eventually brought back to Suffolk County, New York and arrested on the same charges as petitioner and Davis. (T. 1006, 1035).

Detective Smith further testified that he unsuccessfully attempted to locate Ramon DeGross a/k/a "Muncho" and Torres to testify at the trial. (T. 1008-1010). On cross examination, Detective Smith testified that during a photographic lineup Torres identified Isaac Marshall as the person who hit Alex. (T. 1040-1042).

Patricia Molinari is a volunteer emergency medical technician who responded to the scene. (T. 596). She observed Jose on his right side with severe facial trauma. (T. 599). She testified that he was groaning and not breathing adequately, but he was breathing and his bleeding had been controlled, i.e. it was not oozing or spurting. (T. 599-601, 615). She also observed a wound on his back. (T. 600). By the time Jose was placed into the ambulance, he

had no pulse and was not breathing at all, so CPR was commenced. (T. 602). He was not breathing and did not have a pulse when they arrived at the hospital. (T. 605). He was never revived, (Molinari: T. 605), and was pronounced dead at the hospital, (Wilson: T. 1300).

Dr. James W. C. Wilson, the medical examiner who performed the autopsy on Jose Nieves on October 5, 2001, testified that during his external examination he observed that Jose's head and face were very swollen; there was a large amount of blunt impact injury on the face region; Jose's eyelids were very purple and discolored; his nose was fractured; there was multiple contusions and abrasions over his entire face, on the back of his head behind the ears and on his neck; there were tiny abrasions on a portion of his left hand; there were abrasions at his right knee; there were two stab wounds, one in the left flank and one very high up on his right thigh, almost to the buttock area; and there were superficial marks on his back consistent with scratches or punctures from the tip of a knife. (T. 1299-1300, 1303-1305, 1308, 1312-1317, 1322-1323, 1357). Dr. Wilson testified that the stab wound to Jose's left flank was approximately two (2) to three (3) inches deep, extended through the skin and the subcutaneous fatty tissue of the left flank region and did not injure any major blood vessel. (T. 1308-1309). Dr. Wilson further testified that the stab wound on Jose's right thigh projected approximately two and one-half (2-1/2) to three (3) inches into the deep connective tissue of the back of the thigh and also did not impact any major blood vessel, nerve or major organ of the body. (T. 1310-1311). According to Dr. Wilson, he would not expect a large amount of bleeding to emanate or "gush" from either stab wound, the scratches on Jose's back or any of the other injuries, although there would be a continuous flow of blood down his face from the broken nose and bleeding from lip and tongue lacerations. (T. 1309-1313, 1317-1323, 1345-1346, 1362-1366, 1369-1370). On cross

24

examination, Dr. Wilson denied that the amount of blood flowing from Jose's nose or in his mouth could have flown "out among the crowd." (T. 1365-1368).

Dr. Wilson testified that during his internal examination of Jose, he observed hemorrhages in the deeper part of the scalp and in the tissue attached to the skull, indicating multiple and severe blows to his head. (T. 1321-1325, 1353-1354). Dr. Wilson testified that the nature of the object that struck Jose's head "would be something that wouldn't be expected to tear the scalp easily, if at all. The kind of things that could be accomplished with something like fists or feet or feet with shoes on * * * [or] forearms and elbows." (T. 1325-1326, 1337). Dr. Wilson further testified that petitioner's and Davis's boots could have caused the type of injury sustained by Jose. (T. 1326-1327, 1350). Dr. Wilson opined that Jose sustained approximately twenty (20) to forty (40) individual blows to his head. (T. 1327-1328, 1346, 1350-1351, 1380-1381). According to Dr. Wilson, there were no lacerations to Jose's head, other than his lip, and there would be no blood loss outside of Jose's body as a result of the head injuries, with the exception of the fractured nose and lip laceration. (T. 1323, 1347, 1353). Dr. Wilson classified the manner of Jose's death as a homicide and testified that the cause of Jose's death was "blunt craniocerebral trauma," i.e. blunt trauma to the head, and that contributory factors were the stab wounds to his right thigh and left flank. (T. 1328-1329, 1369, 1378-1379). Dr. Wilson testified that the stab wounds were not immediately life threatening, but contributed to Jose's death because "It's not going to help anybody to to [sic] get a stab wound who's sustaining a beating of sort that [Jose] sustained." (T. 1329). He also testified that the stab wounds would not necessarily have caused Jose to fall down and even if they did, they would not have prevented him from standing up again and running away. (T. 1337). However, the head injuries would

have rendered Jose unconscious or "at least in a comatose state." (T. 1338). According to

Wilson, Jose's injuries, particularly the abrasions on his forehead, were consistent with him lying

face down on the ground while being struck by people wearing boots. (T. 1339-1340). He also

testified that he would expect an object or boot coming into contact with Jose's facial area to get

blood on it. (T. 1340).

Dr. Wilson testified that there was ethanol, i.e. alcohol, and cocaine in Jose's system. (T.

1330-1331). However, according to Dr. Wilson, he would not characterize the level of those

drugs in Jose's body as being in a "toxic situation," i.e. Jose would not have died as a result of

the amounts of cocaine in his body had it not been for the trauma he sustained. (T. 1332-1333).

Dr. Wilson further testified that Jose was not in great health, insofar as he was obese, he had a

slightly enlarged heart and he had an enlarged liver with fatty change in the liver cells. (T. 1333-

1334, 1370). However, he testified that he would not expect Jose to have died from his health

condition at the age of twenty-nine (29) years. (T. 1334). According to Dr. Wilson, Jose died

because of multiple severe blows that he sustained to his head which, in addition to his body

responding to the danger of a fight or attack, resulted in the failure of his basic physiology, i.e.

his cardiovascular system, already overstressed from his weight and cocaine ingestion, and his

respiratory system failed. (T. 1335-1337). On cross examination, Dr. Wilson testified that he

would not consider the amount of cocaine in Jose's body to be a contributory factor "to a man

dying after sustaining a beating to the extent that [Jose] sustained." (T. 1372). According to Dr.

Wilson, Jose would not have died but for the beating he received. (T. 1383).

During the autopsy of Jose, Wilson recovered a quantity of cocaine, i.e. six (6) small

packets of "8-balls" or one-eighth of an ounce or three half grams of cocaine, which appeared

packaged for sale, from Jose's body folds. (Lewis: T. 847-850. 886; Wilson: T. 1334-1335).

Molinari testified that she returned to the scene after transporting Jose to the hospital and also transported Torres and Alex to the hospital. (T. 606-607). She testified that Torres was complaining of pain in his arm and Alex had some superficial cuts on his face and swelling to his forehead. (T. 606-607).

At the close of the People's case, defense counsel moved to dismiss the assault in the first degree and gang assault charges involving Alex on the basis that the People failed to prove beyond a reasonable doubt that Alex sustained a serious physical injury, that petitioner or Davis were involved with the injuries caused to Alex, or that petitioner or Davis acted with other individuals. (T. 1384-1385). In addition, defense counsel moved to dismiss the gang assault count involving Jose on the basis that there was no evidence that petitioner or Davis acted with three or more individuals. (T. 1386, 1388). The People requested that the trial court charge assault in the third degree as a lesser included offense of assault in the first degree with respect to Alex. (T. 1386-1387, 1396). The trial court denied defense counsel's motions. (T. 1388-1389).

### 3. The Defense

Neither petitioner nor Davis presented any defense. (T. 1389-1391).

### 4. Charge Conference

During the charge conference (T. 1396-1421), the trial court denied defense counsels' request to charge a justification defense, (T. 1398-1403, 1423-1424), granted Davis's counsel's request to charge with respect to the voluntariness of his statement to police, (T. 1402); granted

defense counsels' request not to give a limiting instruction with respect to the admission of the money recovered from petitioner and Davis, (T. 1407-1408); and denied defense counsels' request for a missing witness charge with respect to Torres, "Muncho," Passias and Hammonds, (T. 1418-1419, 1428-1431). The trial court indicated, *inter alia*, that it would provide "a general definition of circumstantial evidence, which includes definitions of both direct evidence and circumstantial evidence," as set forth in New York Criminal Pattern Jury Instruction 2:57. (T. 1403-1404). No party requested a special circumstantial evidence charge.

5. <u>Verdict and Sentence</u>

Following a jury trial, petitioner was found guilty of manslaughter in the first degree (N.Y. Penal Law § 125.20), gang assault in the first degree (N.Y. Penal Law § 120.07), assault in the first degree (N.Y. Penal Law § 120.10(3) and two counts of assault in the third degree (N.Y. Penal Law §§ 120.00(1)(2)). (T. 1602-1603). On October 28, 2003, petitioner was sentenced, as a second violent felony offender, to concurrent determinate terms of imprisonment of twenty-five (25) years to be followed by five (5) year periods of post-release supervision for each of his convictions of manslaughter, gang assault and assault in the first degree, and to concurrent determinate terms of imprisonment of one (1) year for each of his convictions of assault in the third degree. (S. 14-16)

On October 28, 2003, petitioner was also convicted, upon his plea of guilty, of attempted promoting prison contraband in the first degree (N.Y. Penal Law §§ 110.205.25(2)), and was sentenced to an indeterminate term of imprisonment of one and one-half (1-1/2) to three (3) years, to be served concurrently with the sentence imposed upon him following the jury trial (S.

17-19).

## B.    Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*: (1) that the prosecutor improperly bolstered the testimony of three (3) of the People's witnesses on redirect examination by use of their prior consistent statements; (2) that the hearing court erred in denying his motion to suppress testimony regarding a showup identification procedure viewed by Dennis Hodge; (3) that he was denied a fair trial by a plea agreement between the prosecutor and co-defendant Christopher Passias, pursuant to which Passias agreed not to testify on petitioner's behalf; (4) that he was denied a fair trial by the trial court's failure to conduct an adequate inquiry to determine if one or more of the jurors had become "grossly unqualified" and had engaged in premature deliberations; (5) that he was denied the effective assistance of trial counsel as a result of trial counsel's failure to request the "special circumstantial evidence charge" required in an entirely circumstantial case and to make other timely objections; (6) that the prosecutor's comments during summation and conduct in eliminating Passias as a witness for the defense deprived him of a fair trial; (7) that the evidence was legally insufficient to support his conviction; (8) that the sentences imposed were harsh and excessive; and (9) that he should be permitted to withdraw his plea of guilty to the charge of attempted promoting prison contraband in the first degree if his convictions after trial were overturned.  On March 7, 2006, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*, (1) that petitioner's contention that the prosecutor improperly bolstered the testimony of the People's

29

witnesses on redirect examination was without merit; (2) that the trial court did not err in denying petitioner's motion to suppress identification testimony, since the showup identification procedure occurred in close geographical and temporal proximity to the commission of the crime and was not unduly suggestive; (3) that the petitioner was not deprived of a fair trial by the plea agreement between the prosecutor and Passias because Passias's allocution demonstrated that his testimony would not have exculpated petitioner; (4) that petitioner's contention that the trial court improperly failed to dismiss a juror pursuant to N.Y. C.P.L. § 270.35 was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2) and, in any event, was without merit; (5) that defendant received meaningful representation from his trial counsel; (6) that any prejudice resulting from the prosecutor's improper remarks during summation was alleviated by the trial court's sustaining defense counsel's objections and providing curative instructions to the jury; (7) that petitioner's legal insufficiency argument was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2) and that , in any event, the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (8) that the sentences imposed were not excessive; and (9) that there was no basis to vacate petitioner's guilty plea in light of the determination with respect to petitioner's convictions after trial. People v. Warren, 27 A.D.3d 496, 812 N.Y.S.2d 569 (2d Dept. 2006). On July 6, 2006, the New York State Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Warren, 7 N.Y.3d 796, 821 N.Y.S.2d 826, 854 N.E.2d 1290 (2006).

On or about April 20, 2007, petitioner filed an application for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, the Appellate Division's March 7, 2006 order affirming petitioner's judgments of conviction. By order dated June 26,

2007, the Appellate Division, Second Department, denied petitioner's application for a writ of error coram nobis, finding that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. People v. Warren, 41 A.D.3d 877, 837 N.Y.S.2d 583 (2d Dept. 2007). Petitioner did not seek leave to appeal the June 26, 2007 order of the Appellate Division to the New York State Court of Appeals.

On or about September 26, 2007, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging (1) that the trial court erred in permitting the prosecutor to bolster the testimony of three (3) of the People's witnesses on redirect examination by use of their prior consistent statements; (2) that the trial court erred in denying his motion to suppress testimony regarding a showup identification procedure; (3) that he was denied a fair trial by the plea agreement between the prosecutor and Passias, pursuant to which Passias agreed not to testify on petitioner's behalf; (4) that he was denied a fair trial when members of the jury engaged in premature deliberations and by the trial court's failure to conduct an adequate inquiry to determine if one or more of the jurors had become "grossly unqualified;" (5) that he was denied the effective assistance of trial counsel by counsel's failure to request the "special circumstantial evidence charge" and failure to make other timely objections; (6) that the prosecutor's improper comments during summation deprived him of a fair trial; (7) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt; (8) that the sentences imposed were harsh and excessive; and (9) that he should be permitted to withdraw is guilty plea if his convictions after trial are overturned. Petitioner does not raise an ineffective assistance of appellant counsel claim in his petition. Respondent filed his return on December 7, 2007.

31

## II.  DISCUSSION[2]

### A.  Procedurally Defaulted Claims

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order for federal habeas review to be procedurally defaulted, the state court's reliance on state law must be "clear from the face of the opinion." Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted). If a state court holding contains a plain statement that a claim is procedurally defaulted then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

The Appellate Division, Second Department rejected petitioner's claims (1) that he was denied a fair trial when members of the jury engaged in premature deliberations and by the trial

---

[2] With the exception of petitioner's claim that the sentence imposed was harsh and excessive, see infra, petitioner's claims have been fully exhausted in the state courts, as required by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254.

court's failure to conduct an adequate inquiry to determine if one or more of the juror had become grossly unqualified and (2) that the evidence was legally sufficient on appeal, as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2), then ruled on the merits of those claims "in any event." People v. Warren, 27 A.D.3d at 498, 812 N.Y.S.2d 569. Since the Appellate Division clearly invoked a state procedural rule as a basis for its rejection of petitioner's claims regarding the trial court's failure to dismiss a juror and the legal sufficiency of the evidence, see, e.g. Richardson v. Greene, 497 F.3d 212 (2d Cir. 2007), and petitioner has not alleged cause for the default, actual prejudice, or that it would be a fundamental miscarriage of justice if those claims were not reviewed, those claims (petitioner's fourth and seventh grounds for relief) are barred from federal habeas review and must be dismissed.

B.      Standard of Review under AEDPA[3]

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3] It is undisputed that the state courts adjudicated petitioner's remaining claims on the merits, thus triggering the AEDPA standard of review.

§ 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254 (d)(1). Alternatively, a federal habeas court may "'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Williams, 529 U.S. at 413, 120 S.Ct. 1495). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495; see also Wiggins, 539 U.S. at 520-521, 123 S.Ct. 2527 (holding that the state court's decision must have been more than incorrect or erroneous; its application must have been "objectively unreasonable"). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

1.    Evidentiary Rulings

Petitioner alleges that the state court erroneously (1) permitted the prosecutor to bolster the testimony of Sanchez, Alex and Nanez by use of their prior consistent statements on redirect examination absent allegations of recent fabrication on cross-examination; and (2) denied suppression of pre-trial and in-court identification evidence.

An erroneous evidentiary ruling does not amount to a constitutional violation unless the evidence in question was so extremely unfair that its admission violated fundamental conceptions of justice. Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (citing Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 [1990]). In order to constitute a denial of due process, the prejudicial evidence erroneously admitted must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. (internal quotations and citations omitted). In short, the erroneously admitted evidence "must have been crucial, critical, highly significant.'" Smith v. Greiner, No. 99-CV-5230, 03-MISC-0066, 2003 WL 24015053, at * 4 (E.D.N.Y. Sept. 15, 2003), aff'd, 117 Fed.Appx. 779 (2d Cir. 2004). Federal error does not exist were the state court merely violated its own laws of evidence. See Lewis v. Jeffers, 497 U.S. 764, 780, 100 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

a.    Bolstering Testimony

On direct examination, Alex testified that he spent four (4) days in the hospital following the incident as a result of the injuries he sustained. (T. 508, 512, 546). On cross-examination, he was questioned regarding his grand jury testimony in which he indicated that he spent only three (3) days in the hospital. (T. 546-547, 557). Alex was also questioned on cross-examination regarding his

prior statement to the police at the hospital, in which he failed to indicate that the two black assailants had dreadlocks, that one of the assailants was wearing a white cutoff shirt, or that somebody had taken money from him. (T. 529-531, 539-540). In his prior statement, he gave no description of his assailants other than that they were black males and only mentioned one person, Passias, as having dreadlocks. (T. 531). In addition, he was questioned about his prior statement, in which he indicated that while he was being beaten he heard shouts of "Bay Shore Bloods" and that he was in the club with thirteen (13) people. (T. 541). Alex was also questioned about his prior statement to the police that the argument in Club 69 was between black and Hispanic patrons. (T. 544-545, 563). In addition, Alex was questioned on cross-examination regarding his grand jury testimony in which he indicated that most of the fifteen (15) to twenty (20) black males outside the club had dreadlocks. (T. 553).

On redirect examination, Alex was questioned regarding the way he felt when he was interviewed by the police at the hospital and gave the written statement. (T. 567-568). Alex testified that he "was dizzy, hurt * * * couldn't focus. In pain. Just felt like sleeping." (T. 567-568). In addition, he was questioned regarding how he felt when he testified before the grand jury a few days after he was discharged from the hospital, and he testified that he was still hurting, dizzy and restless. (T. 568). Alex was also questioned on redirect examination regarding his grand jury testimony, in which he described the two assailants that beat him the second time as having dreadlocks and indicated that approximately seventy dollars ($70.00) had been taken from his pocket. (T. 570-571).

On cross-examination, Nanez was questioned regarding his failure to recollect whether there was any blood at the scene and the fact that all he could seemingly remember was that the participants in the incident had dreadlocks. (T. 749, 752-753, 756, 764, 770-772). Nanez was

36

repeatedly asked whether he was told by the prosecutor or detectives to say that he did not see any blood or that the participants had dreadlocks. (T. 753, 757-758, 768, 770-772). On redirect examination, Nanez was questioned regarding his prior statement to police on the date of the incident in which he told the detective that the individual who exited the Honda had long dreadlocks. (T. 773-774).

On cross-examination, Sanchez denied that he had exited the club to assist Alex and Jose in a fight. (T. 300-301). Thereafter, petitioner's defense counsel questioned Sanchez regarding a statement he had made to the police on the night of the incident, that he had been at the club about one (1) hour when Alex wanted to go outside the club and help his brother Jose in a fight. (T. 301-302). Sanchez denied making that statement. (T. 302). Upon reading his statement, Sanchez testified that although that was in his statement, he did not remember the events that way. (T. 303). According to Sanchez, that portion of his written statement was inaccurate, although he admitted signing the statement. (T. 303).

Sanchez was also questioned on cross-examination regarding the portion of his statement to police on the date of the incident indicating that he had already placed "Muncho" in his car at the time the Honda station wagon pulled up. (T. 304-306). He denied that the events happened in the order indicated in his prior statement. (T. 306). In addition, he was questioned about the discrepancy between his statement, in which he indicated that the passenger of the vehicle was wearing a cream colored shirt, and his trial testimony indicating that the passenger was wearing a cream colored sweater. (T. 307-308). Moreover, he was questioned about why he did not include the passenger's statement: "I'm crazy, Wyandanch" in his written statement to police. (T. 310).

On redirect examination, Sanchez was asked whether his prior statement indicated that he

ever helped Alex and Jose in the fight, to which he replied that it did not. (T. 324). He was also questioned regarding whether he ever told the police that the two (2) men who had exited the Honda had dreadlocks and were in their twenties, that one of the men was wearing a white t-shirt with no sleeves and blood on the front of it, that the other man was wearing a cream colored shirt with pads in it, that the man with the white t-shirt said "who wants it?", that he told that man that he was helping out and that the man with the cream colored shirt also punched another Hispanic male, to all of which he responded in the affirmative. (T. 324-326). Sanchez also reiterated that he put "Muncho" in his car only after the Honda had left, and that that was what he had told the grand jury when he testified. (T. 327-328). In addition, he testified that he included the statement of the man with the cream colored shirt that "I'm crazy, Wyandanch" in his testimony to the grand jury several days after he gave the written statement. (T. 328). Sanchez testified that he had not doubt "at all" that petitioner and Davis were the two people he saw "do the things [he] described to [the] jury." (T. 329).

On re-cross examination, Sanchez testified that there was nothing in his written statement regarding the statement made by the man in the cream colored shirt to Alex: "is that your boy, is that your boy?," but he did not know if he testified to the grand jury regarding that statement. (T. 329-330). On re-redirect examination, after he had an opportunity to review the transcript of his testimony to the grand jury, he testified that his testimony to the grand jury included the statement by the man in the cream colored shirt to Alex: "that's your brother, that's your brother?" (T. 333-334). On re-re-cross-examination, he admitted that his testimony to the grand jury did not indicate that the man in the cream colored shirt directed any statement to Alex. (T. 335-336). The People then offered the grand jury minutes into evidence. Petitioner's counsel objected on the basis, *inter*

*alia*, that portions of the testimony constituted prior consistent statements and, thus, were hearsay. (T. 338). The People argued that the minutes were admissible in light of defense counsel's allegations that Sanchez was making recent fabrications, insofar as the prior consistent statements were made right after the written statement was made. (T. 338-339, 341). The trial court permitted portions of the grand jury minutes relating to petitioner's statement to Alex and when "Muncho" was placed into Sanchez's car to be admitted into evidence "based on the nature of the cross-examination and the repeated questioning on both sides * * *." (T. 341-342).

Defense counsel objected to the prosecutor's use of prior consistent statements on redirect examination on the basis, *inter alia*, that he was not claiming that the witnesses' testimony on cross-examination was a recent fabrication; rather he contended that their account of the incident was fabricated as of the date of the incident. (T. 668-669).

While New York law prohibits bolstering, "it is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process rights to a fair trial." Nieves v. Fischer, No. 03 Civ. 9803, 2004 WL 2997860, at * 7 (S.D.N.Y. Dec. 28, 2004)(citations omitted). Courts in this circuit have repeatedly held that "the concept of 'bolstering' really has no place as an issue in criminal jurisprudence based in the United States Constitution," Id., and is a state law evidentiary issue. See e.g. Scott v. Walker, No. 01 CV 7717, 2003 WL 23100888, at * 8 (E.D.N.Y. Dec. 30, 2003)(holding that petitioner's challenge to certain bolstering testimony was not cognizable on habeas review); Smith v. Walsh, No. 00-CV-5672, 2003 WL 22670885, at * 6 (E.D.N.Y. Oct. 20, 2003)(holding that a bolstering claim is not a cognizable basis for federal habeas relief); Diaz v. Greiner, 110 F.Supp.2d 225, 234 (S.D.N.Y. 2000) (holding that bolstering claims are not cognizable on federal habeas review). Accordingly, petitioner's claim that

the trial court improperly admitted bolstering testimony on redirect examination raises a state law evidentiary issue and not a federal constitutional question. Therefore, habeas relief is not available on this claim.

In any event, this claim is without merit. In New York, prior consistent statements are admissible to rebut claims of recent fabrication, see People v. Buie, 86 N.Y.2d 501, 510, 634 N.Y.S.2d 415 (1995); People v. McClean, 69 N.Y.2d 426, 428, 515 N.Y.S.2d 428, 508 N.E.2d 140 (1987); see also People v. McDaniel, 81 N.Y.2d 10, 18, 595 N.Y.S.2d 364, 611 N.E.2d 265 (1993) (holding that "[i]f upon cross-examination a witness' testimony is assailed- either directly or inferentially- as a recent fabrication, the witness may be rehabilitated with prior consistent statements that predated the motive to falsify"), or when the door is opened by the cross-examination of the witness as to portions of his or her prior statement, than other parts of the statement may be offered on redirect examination, People v. Hernandez, 265 A.D.2d 161, 696 N.Y.S.2d 429 (1st Dept. 1999); People v. King, 194 A.D.2d 804, 805, 599 N.Y.S.2d 636 (2d Dept. 1993). The bolstering testimony of Sanchez, Alex and Nanez was admitted on redirect examination only after defense counsel opened the door to such testimony on cross-examination, either by inferring that their testimony was a recent fabrication or by the admission into evidence of only portions of their prior statements. Thus, petitioner has not demonstrated that the Appellate Division's decision that petitioner's "contention that the prosecutor improperly bolstered the testimony of the People's witnesses on redirect examination is without merit," People v. Warren, 27 A.D.3d at 497, 812 N.Y.S.2d 569, is contrary to, or involved an unreasonable application of, federal constitutional law, or that the Appellate Division based its decision on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas relief is not

warranted on this claim.

b.    Suggestiveness of Identification Procedure

Clearly established federal law at the time that petitioner's conviction became final was that a defendant's right to due process included the right not to be subjected to suggestive pre-trial identification procedures that create a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); see also United States v. Douglas, 525 F.3d 225, 242 (2d Cir. 2008), cert. denied, no. 08-5678 (Aug. 7, 2008) (holding that a defendant's right to due process includes the right not to be the object of suggestive police identification procedures that make an identification unreliable); Sales v. Harris, 675 F.2d 532, 537 (2d Cir. 1982)( holding that the Due Process Clause of the Fourteenth Amendment requires the trial court to exclude evidence which is so unreliable as to indicate "a very substantial likelihood of irreparable misidentification").

In order to determine the admissibility of a pre-trial identification procedure, the court must first ascertain whether the procedures employed were "unnecessarily suggestive" of the petitioner's guilt.  Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).  "If the [pretrial identification] procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; * * * no further inquiry by the court is required, and '[t]he reliability of properly admitted eyewitness identification * * * is a matter for the jury.'" Raheem, 257 F.3d at 133 (citing Foster v. California, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)).  If the pretrial identification

procedure was unnecessarily suggestive, the degree of suggestiveness must be balanced against factors indicating that the identification was independently reliable, including the following: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114, 97 S.Ct. 2243. Unnecessary suggestiveness does not, in and of itself, violate due process. See Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Rather, in determining the admissibility of identification testimony, "reliability is the linchpin." Manson, 432 U.S. at 114, 97 S.Ct. 2243. The determinative factor when the confrontation procedure was suggestive is whether under the "totality of circumstances" the identification was nevertheless reliable. Neil, 409 U.S. at 199, 93 S.Ct. 375; see also United States v. Bautista, 23 F.3d 726, 729-730 (2d Cir. 1994) (holding that even if the pre-trial identification procedure was unnecessarily suggestive, the evidence may still be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability). "In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." Raheem, 257 F.3d at 133.

Although showup identification procedures are generally disfavored, they are not *per se* unduly suggestive. Stovall, 388 U.S. at 302, 87 S.Ct. 1967. "[W]hether [an] identification procedure was unnecessarily suggestive depends on (1) [the] suggestiveness of the procedure and (2) [the] necessity of [the] procedure." Bautista, 23 F.3d at 730 (citing United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)). Where a law enforcement officer "has 'or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity.'" Bautista, 23 F.3d at 730 (quoting United States v. Valez,

796 F.2d 24, 27 (2d Cir. 1986)(internal quotations and citation omitted)). Showup identification procedures that occurred within temporal and geographic proximity to the crime have generally not been found to be unduly suggestive. See, e.g. Charlemagne v. Goord, No. 05 Civ. 9890, 2008 WL 2971768, at * 15 (S.D.N.Y. June 30, 2008) (finding that a showup procedure that occurred within thirty minutes and eighteen blocks from the scene of the crime was not unduly suggestive and citing cases). The fact that a suspect was handcuffed, in the custody of law enforcement officers, and illuminated by flashlights or, in this case, headlights, does not necessarily render a pre-trial showup procedure unnecessarily suggestive. Bautista, 23 F.3d at 730. Moreover, a showup procedure is not rendered unduly suggestive by showing several suspects to a witness simultaneously. Charlemagne, 2008 WL 2971768, at * 12 (citing cases).

After conducting an evidentiary hearing, the hearing court found that the showup identification procedure was not suggestive and allowed the prosecutor to introduce testimony concerning both the pre-trial identification and the in-court identification of petitioner. The state court's determination that the showup procedure was not suggestive is not contrary to, or an unreasonable application of, clearly established federal law. See, e.g. Bautista, 23 F.3d at 730 (finding that the showup procedure in which, *inter alia*, the suspect was presented in handcuffs, at night, in the custody of police officers and with his face lit by flashlights was not unnecessarily suggestive where it was conducted immediately following the raid and was necessary to identify perpetrators and release innocent persons); Charlemagne, 2008 WL 2971768, at * 12 (citing cases finding that showup procedures in which the suspect was shown in handcuffs and surrounded by police officers and vehicles were not unnecessarily suggestive). The showup identification of petitioner occurred less than ninety (90) minutes and within one (1) mile from the scene of the crime

and, thus, was in temporal and geographical proximity to the crime. Handcuffs, police custody and illumination by headlights were all necessary incidents of a identification immediately following a large brawl that was conducted in close proximity to the scene of the brawl. See, e.g. Bautista, 23 F.3d at 730 (finding that handcuffs, custody and flashlights were all necessary incidents of an on-the-scene identification immediately following a night-time narcotics raid). Accordingly, habeas relief is not warranted on this claim.

### 2. Prosecutorial Misconduct

#### a. Plea Agreement

The conditions of the plea agreement between the prosecution and Passias were (1) that, if requested, he would testify against his co-defendants, including petitioner; (2) that he would testify truthfully about what happened on the date of the incident; and (3) that he could not testify on behalf of petitioner or Davis, and that if he did, his negotiated sentence of one (1) year in the Suffolk County jail could be enhanced to a determinate term of imprisonment of seven (7) years in an upstate facility. (Plea Agreement [P.] 3-4, 15-18). During his allocution, Passias testified that on the date of the incident, he was at Club 69 and saw, *inter alia*, petitioner and Davis, both of whom were acquaintances of his, and some Hispanic males. (P. 8-11). Passias further testified that there came a time that a disturbance occurred inside the club between, *inter alia*, petitioner, Davis and the Hispanic males, as a result of which employees of the club ordered everybody outside. (P. 9-10). Passias then testified as follows:

> "There was an argument. A couple of people started fighting, and they ran toward the crowd. I'm not sure who was fighting, but I know I seen Warren [petitioner] and Davis in the crowd. * * *. They [petitioner and Davis] was in a brawl. You know

44

what I'm saying? I don't know if they were fighting or trying to break it up, but I know they were in that area."

(P. 12-13). When asked if petitioner and Davis got involved in the fight, Passias responded "yes." (P. 13). He denied that Hammonds a/k/a "Rolo" or Marshall were involved in the fight. (P. 13). When asked if he said anything during the fight, Passias replied that he asked Jose "what was good" and Jose responded that he did not want any problems and was taking his people out of there. (P. 13-14). According to Passias, that was when the fight broke out and everyone rushed toward the fight. (P. 14). Passias testified that during the fight, and even after Jose was on the ground, he commanded the people he was with, including petitioner and Davis, to "get him." (P. 14-15).

A criminal defendant has a right to a fair opportunity to defend himself against the state's accusations by presenting witnesses. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). "[J]udicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000). However, "[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to 'countervailing public interests,'" Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990) (quoting Taylor v. Illinois, 484 U.S. 400, 414, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)), including arresting and prosecuting suspected criminals, Id., preventing perjury and investigating past criminal conduct. Williams, 205 F.3d at 29. "To establish a violation of the right [to present a defense], a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means * * * [and] that [there was] bad faith on the part of the

government." Williams, 205 F.3d at 29; see also United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (holding that the Sixth Amendment does not grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses; it guarantees him "compulsory process for obtaining witnesses in his favor"); United States v. Scopo, 861 F.2d 339, 345 (2d Cir. 1988) (holding that a defendant who complains that his right to call witnesses has been violated must show how their testimony would have been both material and favorable to his defense). In addition, "the defendant 'must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" Williams, 205 F.3d at 29-30 (quoting Buie, 923 F.2d at 11-12).

The state court found that petitioner was not denied his right to a fair trial by the plea agreement between the prosecution and Passias because Passias's "allocution demonstrated that his testimony would not have exculpated [petitioner]." People v. Warren, 27 A.D.3d at 497-498, 812 N.Y.S.2d 569. The state court's determination is not contrary to, or an unreasonable application of, clearly established federal law, nor did the Appellate Division base its decision on an unreasonable determination of the facts. Indeed, it is clear from Passias's allocution that his testimony would not have exculpated petitioner and, thus, the plea agreement did not deprive petitioner of evidence favorable to his defense. Accordingly, habeas relief is not warranted on this claim.

### b.    Prosecutor's Summation

Prior to summations, the trial court instructed the jury, *inter alia*, that they were the finders of fact; that it was for them alone to determine the facts from the evidence which they find truthful and accurate; that the lawyers were not witnesses in the case and, thus, they must disregard any

assertions of fact made by the lawyers which was not based on the evidence; that nothing that the lawyers said at any time was evidence; and that their own recollection, understanding and evaluation of the evidence controlled, regardless of what the lawyers said about the evidence. (T. 1432-1435).

Petitioner claims that the prosecutor engaged in misconduct during his summation because he, *inter alia*, (1) shifted the burden of proof to petitioner by calling attention to petitioner's failure to call a witness his attorney had mentioned during his opening statement; and (2) improperly denigrated defense counsel. During his summation, (T. 1452-1500), the prosecutor made, *inter alia*, the following comment:

> Does he [petitioner's counsel] think this is a game, that he can come up there willynilly and say whatever the heck he wants. And he wants to sit there and has the audacity to sit here and tell you that you have to judge the credibility of witnesses based on inconsistencies that they proffer. The inconsistencies? Do you realize what this whole defense was during this whole trial? We didn't start out just with this innocent explanation and finish with this innocent explanation that the blood is gushing all over those guys. We went from innocent explanation, somebody else stabbed Jose Nieves, the blood gets innocently on his boots. We go to planting of evidence, conspiracy. And after his summation everybody in this particular case lies from square number one, every single witness lied. * * * So we went from where he starts off talking to you about I'm not going to deny it, the victim's blood is on my client's boots. And he gives you this elaborate show waving the shoes around. And now we're going to sit here tell [sic] you we don't even know whose blood is on the shoes? He wants you to judge the credibility of arguments or judge credibility of witnesses based on whether they're consistent, whether somebody makes drastic changes like that, whether somebody's arguments change drastically during the trial right up until this point. What does that tell you about his arguments? What it tells you is commonsense and logic. Commonsense and logic. They're making it up as we go along without any regards to how it all fits together. Gee, this sounds good for this witness. I'll cross-examine this witness on this. Gee, this sounds good for this witness. I'll cross-examine this witness on this. They call fabrication all over the place in this particular case. He's making it up as he goes along. I would call it molding. Let's mold the defense based on how the evidence comes in. And that's exactly what they have been doing in this particular case. He wants you to speculate wildly. He has the audacity to stand here and tell you that I'm asking you to speculate. He's making excuses right and left. So theme number 1 of the defense is they're molding, constantly changing, shifting gears where they're going. It's all

designed to confuse you and distract you and not pay attention to the evidence in total.

(T. 1458-1459).

The prosecutor also commented as follows:

Now, in this particular case [petitioner's counsel] wants to carry on about this order of protection as some kind of they're lying about this. Does it have a ring of truth to it? Simple example. Why is this document, this one piece of irrefutable damning evidence on one of them? If this was this master conspiracy wouldn't there be something just like this on him? (Indicating.) It doesn't have a ring of truth. It doesn't make sense what they're putting out to you. And just because they say it doesn't make it so. * * * Just because they say it doesn't make it true. Facts come from question and answer. You can stand up there and say all you want. Isn't it true that this happened. That doesn't make it so. * * * Oh, but if you stand around and you stomp your feet and carry on and you you [sic] strut around this courtroom acting like it means something, oh, maybe I'll get the jury to buy into this nonsense. The facts come from questions and answers, not by you asking them. Not by just simply asking them. A perfect example of that is Larry Fuller. I told you during my opening this and that. He also told you during his openings that Larry Fuller you're going to hear evidence that Larry Fuller stabbed Jose Nieves. He said it. Where did he deliver? Where was that? Where do these things come from? Just throw them out there and mold the defense as we go along. But not only that. They throw these little quirks out there designed to confuse you to deceive you to make you think something is wrong when there isn't anything wrong. I'm going to give you a couple of examples. I call them cheap shots. Do you remember what Alex Nieves the brother of the deceased here he was asking him questions about the aerial photographs? "Well, where is your brother's car in that aerial photograph. [sic]". To make you think that there's something wrong. Excuse me, the facts in this case show Alex Nieves got to the hospital 6:00 in the morning. And the crime scene is done at like 9, 10:00 in the morning. And not only that, but these photographs aerial photographs don't happen until 4:00 in the afternoon. So he's standing there and he carries on, well, did your brother's car gets [sic] stolen. Alex Nieves is in the hospital. Alex Nieves doesn't know anything about the crime scene. Doesn't know anything about when these photographs were taken. And, excuse me, how many of you have more than one set of keys for your car. But he wants you to carry on. And here's the thing, you don't think he knew when this photograph was taken, the aerial photograph? He's got lab report [sic]. He's got everything. He starts waving all these reports around. He knows what time this was taken. He knows Alex Nieves was in the hospital. But he got up here and acts like it's something. And it's not. It's intended to make you think something's wrong when there isn't.

48

(T. 1461-1463).

In addition, the prosecutor commented as follows:

> And you remember Mr. Sanchez? I'm going to talk about him in a little bit. Mr. Sanchez the fellow from the Dominican Republic described the shirt as what he thought was some kind of a shirt with pads in it or cream colored sweater. That's what he remembered. So Mr. Cassar [petitioner's counsel]- - the defendant through Mr. Cassar is trying to throw it out that somehow I'm putting this photograph with cream colored tint in it to mislead you to make you think, oh, maybe it's really cream colored. Oh, for God sake, who put this photograph in? People's Exhibit 96. Who put in the clothes? That was [petitioner]? It's an amateurish little game to make you think somebody is playing games and doing something wrong. This whole trial has been full of not only switching of defenses here but also cheap trick after cheap trick after cheap trick. That's insulting your intelligence. Basically saying these people in the jury are stupid, they're just going to buy into some of this crap.

(T. 1467-1468).

The prosecutor further commented:

> When Alex Nieves is here and Patricia Molinari is here they want you to - - they're carrying on with Alex and Patricia Molinari, oh, he's not really injured, he didn't get hurt, he got some bumps, bruises and some scrapes. Now all of a sudden we're supposed to believe that Alex Nieves is gushing blood all over the scene. Not according to the testimony of injury Dr. Wilson described. According to what the EMT that arrived at the scene he didn't even need stitches. And the charges against - - the charges concerning Alex Nieves and Assault in the Third Degree. That's what you're going to consider. Was he injured. Was he injured. He wants it both ways. Alex Nieves isn't injured but he's gushing blood. Well, which one is it, Mr. Cassar? You want to get up here and talk out both sides of your mouth in the whole trial insulting the jury's intelligence?

(T. 1471).

Moreover, the prosecutor made such comments as: "That's another example of him trying to mislead you or deceive you," (T. 1473); "Let's just throw something out and go like this sounds good, confuse the jury again," (T. 1475); and "He got up here again, makes stuff up again about how Fats and Rolo now are the stabbers," (T. 1480).

49

Following the prosecutor's summation, petitioner's counsel moved for a mistrial or, in the alternative, for an instruction to the jury that defense counsel is not required to prove any comments made during opening statements, on the basis, *inter alia*, that the prosecutor made personal attacks against him and shifted the burden of proof with his comments about Larry Fuller. (T. 1509-1510). The trial court denied petitioner's counsel's request for a mistrial, but granted his request for a curative instruction to be given to the jury. (T. 1510-1511).

During the jury charge, the trial court instructed the jury, *inter alia*, that they were the sole judges of the evidence; that the evidence consisted of the testimony of the witnesses and the exhibits that were received into evidence; and that petitioner was presumed innocent and the burden of proving the petitioner's guilt beyond a reasonable doubt always rested with the People. (T. 1514-1554). With respect to the curative instruction regarding the prosecutor's summation, the trial court charged as follows:

> Any comments by [the prosecutor] in summation should not be construed as putting any burden on the defendant. There is none. [The prosecutor] in his closing arguments made several reference [sic] to [petitioner's counsel's] opening statements. I instructed you before opening statements and again before closing arguments that nothing the lawyers say is evidence. Rather, their opening statements and closing arguments are arguments and comments on how they believe you should consider evidence. Nothing [the prosecutor] said in his closing arguments including any references to what [petitioner's counsel] may have said in his opening statement or during the trial may be considered by you as requiring the defense to prove. The burden remains on the prosecution to prove every element of each crime charged beyond a reasonable doubt.
>
> Please also disregard any comments that may be viewed as a personal attack on counsel."

(T. 1518-1519).

Generally, a prosecutor's misconduct will require reversal of a state court conviction only

where his or her remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 191, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); see also Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (holding that a prosecutor's misconduct requires reversal only where the remarks sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process). To determine whether a prosecutor's remarks deprived the petitioner of a fair trial, the court must consider (1) the severity of the misconduct; (2) the measures adopted by the trial court to cure the misconduct; and (3) the certainty of a conviction absent the misconduct. See Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).

Petitioner presented his prosecutorial misconduct claims to the Appellate Division on his direct appeal and the Appellate Division held that "any prejudice that may have resulted from [the prosecutor's improper remarks] was alleviated when the trial court sustained the [petitioner's] objections and provided curative instructions to the jury." People v. Warren, 27 A.D. 3d at 498, 812 N.Y.S.2d 569. Petitioner has not established that the state court ruling was contrary to, or involved an unreasonable application of, Supreme Court precedent. Moreover, consideration of the challenged comments in the context of the entire trial demonstrates that they are not sufficiently egregious as to have constituted a denial of due process. Moreover, any error in the prosecutor's summation was alleviated by the trial court's repeated instructions to the jury, *inter alia*, that what the attorneys said during summations was not evidence, as well as by the court's curative instruction regarding the burden of proof. Accordingly, habeas relief is not warranted on petitioner's prosecutorial misconduct claim.

### 3. Ineffective Assistance of Trial Counsel

Petitioner claims that he was denied effective assistance of trial counsel, arguing that he was prejudiced when his trial counsel failed to request a circumstantial evidence charge and limiting jury instructions and to object to the alleged premature jury deliberation and an alleged due process violation resulting from Passias's plea agreement. The Appellate Division determined that petitioner "received meaningful representation" at trial. People v. Warren, 27 A.D.3d at 498, 812 N.Y.S.2d 569.

In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable probability[4] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-694, 104 S.Ct. 2052, 80 L.Ed.2d (1984). To establish a claim of ineffective assistance, a petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

Petitioner has not met his burden of overcoming the presumption that, under the circumstances, his trial counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Nor has petitioner pointed to any defect in his trial counsel's work that fell below an objective standard of reasonableness in prevailing professional norms. The special circumstantial evidence charge was not warranted since the

---

[4] A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d (1984).

prosecutor presented both direct and circumstantial evidence of petitioner's guilt. In any event, the jury charge as a whole conveyed the correct applicable legal principles. Moreover, as noted above, since petitioner has not established that Passias's testimony would have been exculpatory, his due process claim was without merit. In addition, there was no evidence that the jury engaged in premature deliberations.[5] Petitioner's trial counsel was not ineffective for failure to raise meritless claims.

Even if petitioner were to establish that his trial counsel's omissions were unreasonable, petitioner has failed to establish that there is a reasonable probability that, but for those omissions, the proceeding would have resulted differently, particularly in light of the overwhelming evidence of petitioner's guilt. See, Strickland, 466 U.S. at 695-696, 104 S.Ct. 2052 (finding that, in determining the prejudice from counsel's errors, a court must consider the totality of the evidence before the judge or jury);[6] see also, United States v. Guang, 511 F.3d 110, 120 (2d Cir. 2007)

---

[5] Prior to the jury charge, the trial court inquired of juror number five about a family emergency that had arisen that morning. (T. 1506). During that inquiry, the court asked if there was anything in regard to that emergency that would prevent juror number five from sitting as a juror, to which juror number five responded: "No. I already made my personal decision this morning." (T. 1506-1507). The trial court then inquired of juror number five regarding her security concerns, expressed to him by the court officers. (T. 1507). Juror number five replied that she had "Just general nervousness of the severity of the case." (T. 1507). She then stated that "We were just all commenting about the severity of the case and that, you know, do they know our names, is that published before, after the verdict, such things like that." (T. 1507). When the trial court inquired of juror number five whether her concerns would prevent her from continuing to sit as a fair and impartial juror to both sides, juror number five responded: "Not at all." (T. 1507). The trial court then inquired of the prosecutor and petitioner's counsel whether they had any questions of juror number five, to which they each replied in the negative. (T. 1508).

[6] "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court . . . must ask if the defendant has met the burden of showing

53

(finding that trial counsel's failure to object to the admission of evidence did not prejudice the defendant, and thus did not constitute ineffective assistance, where the jury had sufficient evidence from which to find defendants' guilt without the admission of that evidence). Thus, petitioner has not demonstrated that the Appellate Division's determination that he "received meaningful representation," is contrary to, or involved an unreasonable application of, the Strickland standard, or that the Appellate Division based its decision on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted with respect to petitioner's claim of ineffective assistance of trial counsel.

### 4. Sentence

Petitioner contends that his sentence is harsh and excessive.

To evaluate claims of excessive sentencing, the Supreme Court has articulated a principle of "gross proportionality," which finds unconstitutional under the Eighth Amendment only extreme sentences that are grossly disproportionate to the crimes for which they are imposed. See, Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). Federal courts reviewing sentences imposed by state courts on habeas corpus review "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial

---

that the decision reached would reasonably likely have been different absent the errors."
Strickland, 466 U.S. at 695-696, 104 S.Ct. 2052.

courts possess in sentencing convicted criminals." <u>Solem</u>, 463 U.S. at 290, 103 S.Ct. 3001. The "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the exceedingly rare and extreme case" and is reserved "for only the extraordinary case." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-77, 123, S.Ct. 1166, 155 L.Ed. 2d 144 (2003) (internal quotation marks and citation omitted); <u>see also</u>, <u>United States v. Snype</u>, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare). In the Second Circuit, "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see also</u>, <u>United States v. Gonzalez</u>, 922 F.2d 1044, 1053 (2d Cir. 1991) (finding that courts should review the disproportionality of sentences only in rare cases because the legislature's fixing of terms for imprisonment is presumptively valid).

On his appeal to state court, petitioner contended that the sentence imposed was excessive given his "relative youth," his expression of remorse, the lack of overwhelming evidence of his guilt and his lesser degree of participation in the alleged beating, and should be reduced pursuant to state law. (Brief for the Defendant/Appellant on appeal to the Appellate Division, Second Judicial Department, p. 15). Petitioner did not argue on appeal that the sentence imposed violated the Eighth Amendment prohibition against cruel and unusual punishment or that it otherwise violated the "gross disproportionality" principle. Since petitioner did not raise the claim that his sentence was excessive in federal constitutional terms in the state court proceedings, this claim is unexhausted. <u>See</u> <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992).

In any event, the sentence imposed upon petitioner was within the statutory range prescribed by N.Y. Penal Law §§ 70.00 and 70.25. <u>White</u>, 969 F.2d at 1383. Thus, the Appellate Division's

determination that plaintiff's sentences were not excessive is not contrary to, and does not involve an unreasonable application of, federal law. Nor has plaintiff demonstrated that the Appellate Division based its decision on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, petitioner's excessive sentence claim does not warrant habeas corpus relief.

### 5. Withdrawal of Guilty Plea

Petitioner's request to withdraw his guilty plea does not raise a constitutional claim and, thus, is not cognizable on habeas relief. In any event, since his conviction after trial has not been overturned, his request to withdraw his guilty plea is moot.

## III. CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001).

Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: November 18, 2008
       Central Islip, New York

Copies to:

Christopher Joseph Cassar P.C.
13 East Carver Street
Huntington, New York 11743

Suffolk County District Attorney's Office
Criminal Courts Building
200 Center Drive
Riverhead, New York 11901
Attn:   Glenn D. Green, A.D.A.